Good morning, Your Honors. Guy Wallace for Plaintiffs and Appellants. May it please the Court, I'd like to reserve four minutes for rebuttal. The District Court made four fundamental legal errors that directly conflict with this Court's prior holdings and that require reversal. First, the District Court applied the wrong legal standard in holding that Ms. Kirola lacked standing. Under this Court's precedence, specifically Melendrez v. Arpaio, Ms. Kirola was only required to show that she had standing for an individual ADA claim, and she did that. The District Court found that Ms. Kirola had encountered barriers that limited or impeded her access to the City's pedestrian right-of-way, Alamo Square Park, 4 swimming pools, and 3 libraries. Under governing law, that was sufficient to establish injury in fact for purposes of Article 3. Counsel, let's assume that I agree with you about her particular claim. I'm concerned, though, about establishing an accessibility at a programmatic level, both as to the parks and the public right-of-way program. Can you help me with that? Let's assume for a moment that Ms. Kirola has established Article 3 standing for her own direct claims. What about these larger issues? If Your Honor is referring to the claims of the plaintiff class, we believe, yes, those claims were established. The second major error that the District Court made was it failed to apply the Americans with Disabilities Act Accessibility Guidelines, the ADAG, as we call it, to the City's newly constructed and altered facilities. The District Court found ADAG violations in the City's newly constructed and altered facilities, but did not hold the City liable. Now, is this with respect to the 1.6%? This would be a minimum of 1.6%, Your Honor, because there's a second mistake on new construction and alterations in the analysis, and that is the Court held that ADAG did not even apply to the City's parks, playgrounds, recreational facilities, and the pedestrian right-of-way. The City itself has referred to those as the lion's share of facilities at issue in this case. So if the District Court had applied the ADAG to the bulk of the facilities that were in dispute, that 1.6% would be much higher. The other thing, Your Honor, is the District Court itself notes that each facility could have thousands of measurements. That's on page 1259, so 1.6% of what? 1.6% of quite a bit, actually. And, in fact, there were 400 barriers that were found that the City agreed with, that everyone agreed should be fixed, and everyone agreed that the 1.6% should be fixed. That's more than just a few things. We're talking about hundreds. And the final point I would make on that, Judge O'Scanlan, is, unfortunately, in this area, the reality is that people with mobility disabilities are quite severely disabled. Just one or two barriers, like a steep ramp to the entrance of a building or a restroom that cannot be used by a wheelchair user, can preclude meaningful and equal access to an entire facility. Now, here's how that overlaps with program access. If your program lives in that facility with the inaccessible entrance or the inaccessible restroom, that's a problem. And the circuits that have looked at that previously have said where you have that situation, not only would you have a new construction problem, you'd also have a program access problem. I'm talking about cases like Cohen v. City of Culver City, Disabled in Action, or I think the one that illustrates it most simply, Schatz v. Cates from the 11th Circuit. That's the courthouse that has the steep ramp and the inaccessible restroom. People got to whatever their proceeding was, but there were barriers in those critical areas, and that was a program access violation. Council, in terms of how this would be implemented, you've got, of course, a city that's been here for a long time, and you have facilities that were constructed well before the ADA was enacted. Putting aside for a moment the injunctive relief aspect of this, how do we deal with this? Is the city required, from your perspective, to change the old materials if a program is involved, or are we talking about things that occurred, construction that occurred after the enactment of the ADA? At this point, because the ADA became effective in 1992, our view and my understanding of the record is that the bulk of facilities at issue in this case will have had at least some work between 1992 and now. So if there's any work that's occurred on, say, a ramp, that basically converts the entire ramp into a facility that has to comply. Is that correct? Right. Under the regulations, Your Honor, anything that's new construction or any part that's altered should comply with ADAC. The city's blue dot strategy for program access ties in here, too. The city provides its access to, let's say, the parks and recreational facilities through these blue dots, and that means they've had work since 2000. All of that work should be in compliance with the ADAC. And if it's an area of alteration, like the Alamo Square Park playground that Miss Corolla tries to use, when you do the playground, that playground has to comply. The path of travel to it has to comply with the entrance. So ADAC is going to apply very powerfully to most of the facilities at issue in this case. There's a specific regulation that's pertinent to what should be done going forward in fixing the prior violations, and that's 28 CFR in Section 35.151C5. And that governing regulation, which is entitled the Chevron Deference under this court's precedent, says where a public entity has any construction or altered elements that don't comply, they must be made compliant. Now, with respect to existing facilities, those that haven't been altered, the scope of work we think would be governed by the DOJ priorities for the pedestrian right-of-way, and that means you have to provide accessible walkways serving state and local government facilities, public transportation, public accommodations, employers, and then other areas. Those are the five. So from your perspective, basically all infrastructure, whatever constructed, because it would impact the ability of disabled people to come and go to programs or whatever, are proper subjects of this lawsuit? Yes, they would be subjects of this lawsuit. Whether we would need that sort of scope of repair in the context of any adjunctive relief, I would doubt, Your Honor. Specifically, just the ADAC violation elements would need to be fixed, and then the program access priorities for the pedestrian right-of-way, which are in 35.150D, those would need to be done. And on the parks, there's also a DOJ guidance, which we believe is governing, and it says where you have a multi-facility program like your parks, you have to make a reasonable number accessible. Counsel, as I recall, Judge Armstrong felt that there wasn't enough evidence of a systemic refusal to provide barriers. She did identify apparently 1.6% of those that perhaps should be taken care of. But help us sort out what our standard of review is with respect to our finding on the failure of sufficient evidence on the systemic approach. We believe this is a systemic violation, Your Honor. The city officials admitted at trial that the city did not follow or use ADAC as the standard for its newly constructed or altered parks, playgrounds, or recreation facilities. And that's the city's director for physical access, Mr. Scott, who testified that ADAC did not apply to parks and playgrounds. And so you're arguing that it's a conscious decision not to apply ADAC or it was kind of a legal conclusion that ADAC doesn't apply? It was a legal conclusion on the part of the city, a position that ADAC did not apply, and so they didn't follow it. They didn't use it as the design and construction standard for those facilities, Your Honor. So that issue is then in front of us at this point to determine whether or not it does apply. Is that your argument? Yes, but we believe that the application of ADAC to the pedestrian right-of-way, parks, playgrounds, and other recreational facilities is settled by Fort Yoon versus City of Lomita, which this court will do that. Judge Gould, if I can interject. Just to get back to Judge O'Scanlan's question a few minutes ago. What is the standard of review for us for all these issues of systemic violation? Review de novo? Or are they viewed like a factual decision? These legal errors would be reviewed de novo. There's no question from the opinion that the district court believed  in the pedestrian right-of-way, and that was the root cause of her belief that we'd only shown ADAC violations as to 1.6%, because when you take those facilities out of the equation of the proof, then you're down to libraries and pools, which is just a small fraction of the ADAC violations that were shown. And those also are at pages 65 to 76 of our opening brief. The root cause of the inaccessibility here, though, is systemic. The city did not believe ADAC applied to those types of facilities, so it didn't follow it. And you can see that discussion at pages 17 and 26 of our reply brief. So all of those types of violations would need to be fixed, Your Honor. Essentially, the city had a policy and practice of not using ADAC for parks, playgrounds, pedestrian right-of-way. So it's a widespread problem. The problem, the issue on remit would be for the district court to determine the scope and timing of injunctive relief. Counsel, how does this work practically? Certainly for disabled individuals, these are huge issues. For the taxpayers, these are monumental issues, perhaps involving billions and billions of dollars. Let's just say we agreed with you entirely, arguendo. How does it work? Do we just order, as we have said back in the district court, but basically with an order to do all of this? Does it have to happen immediately? Does it have to happen over time? The city seems to have a very strong, conscientious, well-funded program to address issues of disability. They have many people working on it, seem to be quite dedicated. You seem to be asking, based upon your understanding of the law, for something far, far greater, how do we deal with this? I mean, it's kind of like everybody's trying to do the right thing, but it seems to be the dividing line. Does it apply? Does it not apply? But if it does apply, how are we to comply with this act? How do we do it? Do we order the city to do all these things? And if so, within what time period? What we think in terms of how the new construction alteration violations would be addressed, there is that regulation, 28 CFR 35.151C5, and there would need to be further evidentiary proceedings in the district court on the locations where the construction did not comply with ADAC, and then there would need to be a schedule set for the removal of those barriers, and that would take place over a period of time. And I believe, as in the context of other systemic reform litigation, Your Honor, there might be presentations from both sides as to how long that would take. I believe it might take some time. But certainly at this point, given that we have a large volume of ADAC violations because of what's taking place here, there is going to need to be injunctive relief of fairly wide-ranging nature. Do you agree that issue number one for us is does ADAC comply? Yes. And we believe that drives the conclusion also on program access because the city believes that it can substitute these blue-dot accessible parks as a subset of facilities in which it's going to provide its parks and recreational program, but even those have the flaws of not being ADAC compliant. And there's a specific regulation, and this court has held in Pierce 526F1216, and there's a reg 35.150B1. When you alter facilities to provide program access, you have to follow the new construction regulation, and that means you have to comply with ADAC. And I believe I'm coming up on four minutes. You'll be reserved for right here at the time, counsel. Thank you. We'll hear from the city attorney. Good morning, Your Honors. Deputy City Attorney Jim Emery for the city and county of San Francisco. May it please the court. First off, the city embraces ADAC. The city has fully complied with ADAC, as the district court found as a factual matter. There are isolated departures from the dimensional requirements of ADAC throughout the city's 49 square miles. There's no systemic problem, and there is no showing, not only to the class representative, but that any testifying class member at trial was encountered any barrier as a result of a violation of ADAC. Except with respect to the 1.6%. Am I right in that? The individual departures from ADAC were the result of expert testimony. That was not any class member having confronted a barrier. I want to push back a little bit on a characterization that Mr. Wallace made about how the city approaches ADAC. ADAC applies to parks and park facilities to an extent. Certainly ADAC, the city used ADAC in its design and construction of park facilities, including the recreation centers. Those are buildings. They have a gym. They have bathrooms. They have meeting places where the Rec Park Department provides its programs. But are they ADAC compliant? And those, yes, those are ADAC compliant. And this is the robust and sophisticated infrastructure that San Francisco has, which the district court found includes design review pursuant to ADAC for those facilities to which ADAC applies, which includes the portions of a pool like the restrooms and the entrance and the common areas. It's only the 2010 new version of ADAC that's not part of this lawsuit that actually goes into pool facilities. But the common areas of pools, all the areas of a rec center, all the libraries, they are all designed and constructed pursuant to ADAC. There is design review. There's construction review. And then as the district court found before a certificate of occupancy can be issued on any of these buildings, a trained disability access professional looks at the finished building and signs off on it. There's a story that's in the district court's findings of Kevin Jensen refusing to issue a certificate from one of the libraries because he found an ADAC violation. That is the city's systemic approach that ensures that there are no more than perhaps isolated departures from ADAC because no building is perfect, because there are thousands of measurements in every building, because there are hundreds of measurements in an individual bathroom. What is the evidence in the record that, assuming the city follows ADAC, that there was compliance with ADAC? I gather the isolated barriers on both sides would identify as not in compliance. That's right. Those isolated barriers are in the record. Ms. Carolla did not present evidence at trial that she encountered any of those isolated barriers or that any of those isolated barriers to ADAC affected her approach or enjoyment or use of those facilities. Is this an argument or is it addressed to the specific question of whether Junctive Relief could apply to these isolated barriers? I think Melendrez versus Arpaio makes it clear that this is not a standing issue. In Melendrez, the Ninth Circuit held that the Rodriguez's, who were the only class representatives who had been stopped not in a sweep, that they had failed to prove a violation. But that they had standing. The court says that explicitly. So when I go back with this teaching from Melendrez versus Arpaio, that the failure of proof at trial does not undermine standing, when I take that teaching and now look back at Lewis versus Casey, I understand Lewis versus Casey now to be an issue of failure of proof for system-wide relief, for entitlement to system-wide relief. So that's how I am trying to resolve what the Supreme Court called the tension in the cases with the recent help of Melendrez versus Arpaio. So in this case, you make the point that the plaintiff did not personally encounter these barriers. I guess I'm not really disputing what the gist, or the reasoning with respect to what she did encounter. But for purposes of this class as a class, so how are we to deal with that? You've got a few isolated, from your perspective, a few isolated barriers. You indicate that the city and county does intend to comply with everything. That if there's anything missing, it's because it's an imperfect system, and these are listed, you're working on those. So under the circumstances, what requirement is there in order for them to get, say, injunctive relief that Ms. Grohl or anybody else that's part of the class have encountered the barriers of these individual, whatever it is, 1.6% or whatever it is? I think there are three steps. First, we have to look at what the plaintiff's evidence, did the plaintiff demonstrate that she suffered a violation of the ADA? That can either be ADAG or that can be program access. And we focus first on the evidence relating specifically to the plaintiff. And then we look at any violations of the federal law, of the ADA, that she proved. And then we look to see if there was a systemic deficiency in the city's policy or practices that led to that violation. And this is the necessary bridge, in my view, looking at Lewis versus Casey, to system-wide relief. If you then identify a system-wide deficiency in the city's policy and practices, then the third step would be to look and see whether that systemic deficiency had caused widespread harm to the class. And only if a systemic deficiency that caused a harm to the named plaintiff and class rep caused widespread harm to the class, at that stage, then the plaintiff and the plaintiff class are titled to system-wide relief. So that's what the district judge purely thought had not been proven. Exactly. And so in this context, I think this is clearly an issue of proof rather than legal errors. I do want to circle back, though, before my time is up, to explain the difference of a few between the city, between San Francisco and the plaintiffs, about the scope of ADAG. The city does believe, and for the Fortune case supports this, that ADAG does not expressly apply to the public right-of-way. If you look at the 2010 version of ADAG, it specifically reserves the public right-of-way. It has a chapter for the public right-of-way, and it says reserved. And that's a pretty good indication that the federal government does not believe that ADAG applies to the public right-of-way. You look at the specific requirements. ADAG applies to a facility and a site. ADAG defines a facility, and the site is inside the property line. The public right-of-way here presumably, of course, are streets. What about sidewalks? Yes, streets. The public right-of-way is a street and a sidewalk, including the curb ramps and the crosswalks. And this lawsuit, as it was narrowed for trial after class certification, addresses the public right-of-way, libraries, and rec park facilities. The public right-of-way is not covered by ADAG. What Fortune says, and what San Francisco agrees with, is that where ADAG doesn't expressly apply, you use the dimensional requirements of ADAG to the extent possible, to the extent practical. And in the public right-of-way, you need to understand that there are site constraints that are obvious. I mean, you have to follow the street. You have to follow the contour of the street. You get to a corner. There may be a firebox. There may be other obstructions in the corner and the city, or there may be a curb that's very, very tall. Or I live on Dolores Street. Dolores Street has a 12% slope in San Francisco. When you're designing a curb ramp to follow a street that's already going up high, you're not necessarily going to be able to design a curb ramp that complies with the dimensional requirements. It's the understanding of the inherent building constraints of being on the public right-of-way, of following the contours of the street, that I think is the source of the very sensible federal determination that ADAG does not strictly apply to the public right-of-way. And the proposed guidelines for the public right-of-way that aren't law, they further demonstrate that federal agencies wouldn't be preparing proposed guidelines for the public right-of-way if ADAG already covered the public right-of-way. And similarly, I want to explain a little bit about ADAG and recreational facilities. The city agrees that rec park facilities, to the extent, you know, it's like a college campus. You know, you have Golden Gate Park. It has particular destinations, like the Conservatory of Flowers, like the Japanese Tea Garden. The ADAG path of travel, accessible path of travel requirements, they apply from the transit stop, from the accessible parking space to the destination, just like on a college campus, to the science building, to the humanities building. And then depending on what the facility is, if it's a swimming pool, it's not ADAG. But if it's a recreation center with bathrooms, yes, then ADAG applies to that facility, too. But when you have an outdoor recreational trail that doesn't go to a destination where the point of the trail is simply to be outside and to meander, then the outdoor recreational, again, it's only proposed guidelines, but there's no dimensional federal regulation, just like on street parking in Fort Union. But for these recreational trails, the city did do more than it was required to. It looked at the proposed regulations for outdoor recreational trails and applied them. There's testimony trial, and the plaintiffs in their briefing makes, criticizes it that Mr. Scott, at that time an MOD director of physical access, he walked all the recreational trails in Golden Gate Park. And using his common sense, in the absence of dimensional requirements, he determined which recreational trails were accessible, and the city created a map and made that information available to the community. If you may, you may want to address the first argument made by your opponent with respect to Article III standing. With Melendrez, I agree there is Article III standing in this case. You do? I do. And therefore, Judge Armstrong appeared in that regard? Well, Melendrez, to give Judge Armstrong credit, came out after her decision. When you read Lewis v. Casey, it sounds very much like only one of the 22 class representatives had standing, because that was the only class representative who had proved a violation. So I don't think there's any change of result because of that determination of standing versus failure of proof for entitlement to system-wide relief. But the three steps that I outlined, the first thing that Judge Armstrong found, as a matter of fact, in the standing analysis disposes of this case because she said that she found that the plaintiff, Ivana Carolla, did not encounter any violation of the ADA. You read Lewis v. Casey, that sounds like a lack of standing. You read Melendrez v. Arpaio, and it's clear that it's not a lack of standing. But it is a failure of proof, and it disqualifies both the plaintiff and the plaintiff class from systemic relief. You don't even get to my second question and my third question, which would be necessary to entitle the class to injunctive relief. Since there's no violation, there's no systemic deficiency in city policies and practices that cause that violation, and furthermore, there's no widespread harm to the class caused by that deficient policy or practice. Is that the reason why the district judge declined to enter an injunction with respect to those facilities that had been built since the adoption of the ADA? That's right. That's exactly right. She was following Lewis v. Casey, and whether you call it standing or whether you call it a failure of proof and lack of jurisdiction for systemic relief, it is clear that plaintiffs and the plaintiff class fell short in this case after a five-week trial. Counsel, with respect to the isolated barriers, presumably she has standing and perhaps even possibly can come within the expert testimony with respect to those barriers. In other words, she would have standing to request injunctive relief with respect to those. With respect to barriers that she encountered and that she approved, that's what she has standing for in an individual case. Okay, well then, since there was no injunctive relief granted, what are those barriers that might be subject to that isolated area? As a matter of fact, the district court found that the plaintiff encountered no ADA violations. She visits the libraries. She visits the renovated pools. And in her eight pages of direct testimony, she described not a single problem or a single barrier with a newly constructed and altered facility. If you read the testimony, there are problems with the sidewalk surfaces, which is a maintenance issue. She doesn't allege that the sidewalks were designed or constructed in violation of the ADA. She alleges that they're broken up. As a matter of fact, the district judge found that San Francisco's maintenance programs are reasonable. We have the two programs with the funny acronyms, SERP and ASAP, the Accelerated Sidewalk Abatement Program, which responds proactively to requests from people throughout the city, and then the Sidewalk Inspection and Repair Program, SERP, which proactively inspects 80 miles of sidewalk every year. Between those two, the city reasonably responds to the needs of the plaintiff's class. It sounds to me, in light of your statement about ADAG, that the difference between you and the plaintiffs is the issue of proof. You think that it's a matter of law. ADAG does apply, except for the sidewalk right-of-way. I know it's a little broader than that, but basically, except for that, your point is that they simply, there's a failure of proof, and that's the reason why the district judge couldn't order any more than she did. Well, it's certainly why she wasn't required to order any more than she did. The court has a measure of discretion based on her factual findings, A, that the single-name plaintiff encountered not a single violation of the ADA, and B, that there was no widespread harm to the class. Those are independent reasons why it was proper for the district judge to deny system-wide relief. If, absent a systemic failure of policies or practices, as an individual, had she shown a violation of the ADA, there would be, the court would have the power to issue an injunction to correct those particulants, but not ones that the experts found in totally different facilities. An individual plaintiff has standing to address ADA violations that the plaintiff encounters, ADA violations in a building that he or she couldn't go to, and any other violations that she was perhaps in facilities or areas that she was deterred from attending. There is no evidence or suggestion or finding that Ms. Carolla was deterred from going to any other facilities that are outside the proof. The only- Thank you, counsel. Your time has expired. No, I'm- It starts counting back after- I'm sorry. It goes to zero. I'm sorry. Okay, I'm just a little enthusiastic. Thank you. Thank you, counsel. The city's the best. Very well. Mr. Wallace, you have some reserved time. Okay. Thank you. In 30U, this court held that ADAC has detailed requirements for the basic fundamentals of accessibility for standards for curb ramps, ramps, accessible paths and routes, entrances, restrooms, and other elements. You disagree with the city's position that ADAC does not technically cover, and I'm going to use a broader term, public rights in what you disagree with. Yes. Yes, and we think 40U is dispositive of that, and it's based on the DOJ's Title II guidance from 1994, Your Honor. There was nothing new about all of that. So you apply ADAC and its dimensional requirements to all paths of travel. Now let's take the botanical gardens, which my opponent was referencing. Using the proposed guidelines, those standards allow you to go 50% steeper than ADAC, and so the upshot was the city didn't use ADAC when it's renovated its botanical gardens, and we don't have accessible ADAC-compliant paths out there. Now this applies to Judge O'Scalin's concern about systemic. You see, you could have a few non-compliant paths, but we have a class of 20,000 people. Many members of that class are going to want to go to the botanical gardens. Let's take another example. As far as the failure proof is concerned, that would obviously trouble the district judge. Is it your position that the class simply doesn't, at this point, simply doesn't have to show an actual experience with a particular barrier? We did that too, Your Honor. Ms. Carolla experienced access problems with respect to turning up the newly constructed playground at Alma Square Park. St. Mary's Playground is a brand-new playground constructed in 2009. We held a child who was a wheelchair user who couldn't use it because the pathways to it are 13% to 15% gradient steep, just couldn't get in. We've got another example like that at Golden Gate Children's Playground that's new. Another class member couldn't take her wheelchair-using child to that playground. And this is all a product. You do think that all the district judge needed by way of proof was put into evidence. Is that correct? Yes, it was. And you believe that our role is to evaluate that evidence to know what was opposed to giving the district judge some type of deference? I think the court's role is to look at whether ADAC was applied to NOVO and to provide instruction to the district court judge to apply ADAC to these types of facilities, the pedestrian right-of-way, parks, playgrounds, recreation facilities, all facilities where the fundamentals of ADAC for access can be applied. And when that is done, we think the outcome is not 1.6%, Your Honor, it's far higher. And then we also think that 28 CFR Section 35.151C5 compels that the elements that are not compliant be made accessible so that people with disabilities won't have to face those barriers. Because, you see, just even if it were true that it was just a few barriers, they're all permanent and in place. The concept of isolated doesn't really apply here because the barrier is there every day. And multiple different people who are wheelchair users might encounter the barrier, like the entrance to the tea garden that didn't get right with the steep ramp. And so, you know, we had the class member with the wheelchair-using child who couldn't get in there and go with the class members on the field trip and ended up in tears. That's just one kid. Many other wheelchair-using children might not be able to get into the tea garden, but they could have if the city had done the work right. And I believe my time is up. Thank you. Thank you, officers. The case just argued will be submitted for decision, and the court will adjourn.
judges: O'scannlain, Gould, M. Smith